## The Illinois Central Railroad Company

*v.*

## Henry J. Leiner, Admr.

*Opinion filed April 24, 1903—Rehearing denied June 9, 1903.*

1. RAILROADS—*company is liable for wantonly causing death of trespasser.* A railroad company is liable for the death of a person resulting from the reckless and wanton conduct of its servants, even though such person may have been a trespasser.

2. SAME—*gross negligence defined.* Gross or willful negligence is such a lack of care for the rights of others as implies a disregard of consequences or willingness to inflict injury, even though there is no element of ill-will toward the party injured.

3. SAME—*whether negligence was gross is a question of fact.* Whether the injuries inflicted in a particular case were the result of willful or reckless conduct amounting to gross negligence is a question of fact for the jury.

4. FELLOW-SERVANTS—*when relation of fellow-servant does not exist.* A conductor riding home on free transportation to spend Sunday with his family is not a fellow-servant of those in charge of the train, even though they are all employees of the same company.

*Illinois Central Railroad Co. v. Leiner*, 103 Ill. App. 438, affirmed.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of St. Clair county; the Hon. WILLIAM HARTZELL, Judge, presiding.

This is an action on the case, brought against appellant to recover damages for the death of appellee's intestate, William A. Wing, which occurred January 12, 1901, in a rear-end collision in the city of Belleville, St. Clair county, Illinois, while said William A. Wing was riding in the caboose of a certain freight train of said defendant. The case was tried by the court, and a jury who returned a verdict for the plaintiff below for the sum of $5000.00. Judgment was rendered upon the verdict, after overruling motions for new trial and in arrest of judgment. The case was taken by appeal to the Appellate Court, where the judgment has been affirmed. The present appeal is prosecuted from such judgment of affirmance.

At the close of all the evidence the defendant asked the court to give the jury a written instruction finding the defendant not guilty. This instruction was refused.

Kramer, Creighton & Shaeffer, (John G. Drennan, of counsel,) for appellant.

M. W. Borders, for appellee.

Mr. Chief Justice Magruder delivered the opinion of the court:

Upon the trial of this case no instructions were asked by the appellee. The appellant presented to the trial court twenty-three instructions to be given to the jury, of which twelve were given as asked, and eleven were refused. No complaint is made as to the action of the trial court in the admission or exclusion of evidence. Substantially, the only question in the case is that which arises from the refusal of the trial court to instruct the jury to find for the defendant. Nearly all the instructions, asked by the appellant and given in its behalf, left it to the jury to determine whether the servants of the appellant in charge of the trains which collided, or any of them, were at the time guilty of such willful and wanton misconduct, as directly contributed to the death of appellee's intestate, William A. Wing. The only material question, therefore, is whether there is sufficient evidence in the record tending to prove such wantonness or willfulness. That question has been settled in favor of appellee by the judgments of the lower courts. As, however, appellant claims that the evidence does not tend to show that the injury, which resulted in Wing's death, was wantonly and willfully inflicted, the evidence will be examined so far as it bears upon that proposition.

*First*—Appellant claims that, at the time deceased lost his life, he was a trespasser upon the freight train upon which he was riding. The deceased was an em-
202—40

ploye of the appellant as a conductor upon one of its freight trains, but, as we understand the evidence, on the evening of Saturday, January 11, 1901, he had brought his freight train to East St. Louis, and was there released from his work, so that he was entitled to go to his home at Sparta to spend Sunday. In order to reach Sparta, it was necessary for him to ride upon one of appellant's trains from East St. Louis to Coulterville, passing through Belleville. Belleville is thirteen miles south-east from East St. Louis. On the evening of January 11, the deceased obtained from the proper officials at Carbondale by telegraph a telegraphic pass, permitting him to ride on a certain passenger train No. 203, which was to leave East St. Louis at 9:04 P. M. that evening. The pass did not reach him until 8:58, about six minutes before the passenger train was to start. As we understand the proof, it was necessary for him to walk some 500 feet to reach the passenger train from the place where he obtained his pass, and it is quite evident that he missed the train from lack of time to reach it. He then made application to the conductor of freight train No. 255 for transportation on that train to Coulterville through Belleville. He stated to the conductor, that transportation had been furnished to him, and the conductor permitted him to go upon the train, and told him to enter the caboose, and go to bed, and he would wake him up when they reached Coulterville. The conductor did not require him to exhibit his pass, or any evidence of his right to travel upon the freight train. Freight train No. 255 consisted of thirty cars drawn by one engine with a caboose at the end of the train. Although this train was to leave East St. Louis at ten o'clock, it did not actually get started until 12:40, and, although it ordinarily took only one hour to go from East St. Louis to Belleville, being a distance of only thirteen miles, yet the train did not reach Belleville until 3:20 on the morning of January 12, 1901. It consumed two hours and

forty minutes in making the journey from East St. Louis
to Belleville.   The delay was caused by the inability of
the engine to haul the thirty cars to the top of the ele-
vation near the western limits of the city of Belleville.
The conductor was obliged to divide his train, and take
each half up the hill separately.   In addition to this, it
was necessary to detach the engine and go to Belleville
and get water and return.   The deceased went to sleep
in the caboose before train No. 255 left East St. Louis,
and was asleep in the caboose when the train arrived at
Belleville.   By the terms of some rule of the company,
as is claimed by the appellant, freight train No. 255 car-
ried no passengers, though no such rule was produced
in evidence.

It is claimed, that the deceased was a trespasser, upon
the alleged ground that, although he was an employe of
the company—though not then engaged in the work of
the company—and although the company was then in-
debted to him in the sum of $100.00 for services performed
by him, yet that he had not become a passenger, while
riding upon this freight train, which was not authorized
to carry passengers, notwithstanding the fact that he
was riding with the consent of the conductor.   In other
words, the deceased is alleged to have been a trespasser,
because he was riding on a freight train in violation of
a rule of the company.   We do not deem it necessary to
stop to discuss the question, whether he was a trespasser,
or not, because of the facts thus stated.   If he was, the
appellant would be liable if he was killed through the
wanton or reckless conduct of the appellant's employes
in charge of the trains.

In *Toledo, Wabash and Western Railway Co.* v. *Beggs*, 85
Ill. 80, we said (p. 84): "Was defendant in error a passen-
ger on this train, in the true sense of that term?  He was
traveling on a free pass issued to one James Short, and
not transferable, and passed himself as the person named
in the pass.  By his fraud he was riding on the car.  Un-

der such circumstances the company could only be held liable for gross negligence, which would amount to willful injury." We have discovered nothing in the conduct of the deceased, as developed by the testimony in this regard, to indicate that he was guilty of any fraud against appellant, or practiced any deceit upon the conductor of freight train No. 255. But even if he had been guilty of such fraud, the appellant would be liable in this action, if it was guilty of such gross negligence as amounted to willful injury. (See also *Chicago and Northwestern Railway Co.* v. *Chapman*, 133 Ill. 96). In the cases of *Toledo, Wabash and Western Railway Co.* v. *Brooks*, 81 Ill. 245, and *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Best*, 169 id. 301, no question of wantonness or recklessness is involved or raised in the pleadings.

The view, thus expressed, was embodied by the appellant in several of the instructions asked by it, and given in its behalf by the trial court. One of those instructions was as follows:

"The court instructs the jury that, even if you believe from the evidence in this case, that Ring, the rear brakeman on train No. 255, should have flagged the extra train that was following the train at the time said train No. 255 was standing at the depot in the city of Belleville, yet, unless you further believe, from the evidence in this case, that such failure to flag the said extra train upon the part of said Ring amounted to willful and wanton misconduct on his part, plaintiff would not be entitled to recover in this case, if you further believe from the evidence that the said W. A. Wing had no right to be upon said train at the time he received his fatal injuries."

Another of said instructions, given for the appellant, was as follows:

"The court instructs the jury that, if you believe from the evidence in this case that W. A. Wing, the deceased, had no right to be upon the train No. 255, and had no right to ride on said train from East St. Louis to Belle-

ville at the time in question, then, under the law, he was a trespasser upon said train, and the defendant in this case is not liable for an injury occurring to said W. A. Wing while upon said train, unless such injury was the result of the willful and wanton misconduct of the servants of the defendant."

*Second*—Whether, therefore, the deceased was a trespasser or not, the question remains whether there is evidence tending to show that he was killed through the wanton or reckless conduct of the appellant's employes, who were in charge of the trains whose collision caused his death.

The question, whether a personal injury has been inflicted by willful or wanton conduct or gross negligence, is a question of fact to be determined by the jury. In *Chicago, Burlington and Quincy Railroad Co.* v. *Murowski*, 179 Ill. 77, we said (p. 80): "Whether the defendant was guilty of willful or wanton conduct or gross negligence was purely a question of fact for the jury to determine from all the evidence, introduced by the respective parties, bearing upon that point in the case, and it was not the province of the court to inform the jury that some particular fact in the case was conclusive of that question." (See also *Odin Coal Co.* v. *Denman*, 185 Ill. 413; *Carterville Coal Co.* v. *Abbott*, 181 id. 495; *Lake Shore and Michigan Southern Railway Co.* v. *Bodemer*, 139 id. 596).

It is not always easy to define what degree of negligence the law considers equivalent to a willful or wanton act. The character of an act as being willful or wanton is greatly dependent upon the particular circumstances of each case. In the case of an injury to a trespasser, a railroad company has been said to be liable for "such gross negligence as evidences willfulness." (*Illinois Central Railroad Co.* v. *Godfrey*, 71 Ill. 500). Such gross negligence, as evidences willfulness, is "such a gross want of care and regard for the rights of others as to justify the presumption of willfulness or wantonness." It is

such gross negligence as to imply a disregard of consequences or a willingness to inflict injury. (*Lake Shore and Michigan Southern Railway Co.* v. *Bodemer*, 139 Ill. 596).

To constitute willful and wanton negligence, it is not always necessary to prove that the defendant's servants are actuated by ill-will towards the plaintiff. In *East St. Louis Connecting Railway Co.* v. *O'Hara*, 150 Ill. 580, we said (p. 585): "If it be true, as the evidence tends to show, that the defendant's servants, at the time plaintiff was injured, were running their engine in the dark, without a headlight, or a bell ringing, and at a high and dangerous rate of speed, along a much frequented street, and where many persons were likely to be passing on their way to the ferry landing or otherwise, such acts would be liable to the construction of being in wanton and willful disregard of the rights and safety of the public generally, so as to amount in law to wanton and willful negligence. And it was not necessary, in order to raise an inference of such negligence, to prove that the defendant's servants were actuated by ill-will, directed specifically towards the plaintiff, or to have known that he was in such position as to be likely to be injured."

In *Elgin, Joliet and Eastern Railway Co.* v. *Duffy*, 191 Ill. 489, we said (p. 492): "The declaration charges the defendant with willfully and maliciously inflicting the injury. If the record discloses any evidence tending to support that averment, negligence on the part of the appellee, if conceded, would not excuse the appellant. (*Lake Shore and Michigan Southern Railway Co.* v. *Bodemer*, 139 Ill. 596.) The evidence tends to prove that the train was going at a high rate of speed around a sharp curve, where the view was obstructed by an embankment, approaching a street which was much traveled, giving no warning by the ringing of the bell or sounding the whistle, and this testimony, without passing upon its weight or whether it was overcome by other evidence, tended to prove the charge of willfulness and wanton-

ness in the management of the train. The jury might well have based its verdict upon that theory of the case."

In *Odin Coal Co.* v. *Denman*, 185 Ill. 413, we said (p. 418): "'Willful' is a word of familiar use in every branch of law, and although in some branches of law it may have a special meaning, it generally, as used in courts of law, implies nothing blamable, but merely that the person of whose action or default the expression is used is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to nothing more than this: that he knows what he is doing, and intends to do what he is doing, and is a free agent."

In *Carterville Coal Co.* v. *Abbott*, 181 Ill. 495, we said (p. 502): "Where an owner, operator or manager so constructs or equips his mine that he knowingly operates it without conforming to the provisions of this act, he willfully disregards its provisions and willfully disregards the safety of miners employed therein."

Thompson in his Commentaries on the Law of Negligence, (vol. 1, sec. 21), defines willful negligence to be "a willful determination not to perform a known duty." The same author says: "The true conception of willful negligence involves a deliberate purpose not to discharge some duty, necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed upon the person by operation of law." (Ibid. sec. 20). He also says: "An entire absence of care for the life, the person or the property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness, such as charges the person whose duty it was to exercise care, with the consequences of a willful injury." (Ibid. sec. 22).

The court gave for the appellant, at its request, upon the trial below the following instructions:

1. "The court instructs the jury that the plaintiff in this case is not entitled to recover, unless you believe

from the preponderance of the evidence in the case that
the servants of the defendant in charge of the trains in
question, or some of them in charge of said trains, were
at the time guilty of willful and wanton misconduct, and
that such willful and wanton misconduct resulted in, and
was the cause of, the death of the said W. A. Wing.

2. "The court instructs the jury that the mere viola-
tion of a city ordinance, regulating the rate of speed of
a train through a city, or the rules of the railroad com-
pany with reference to the management of its trains,
does not of itself amount to a willful and wanton mis-
conduct.

4. "The court instructs the jury that, even if you be-
lieve from the evidence in this case, that the servants of
the defendant in charge of the extra train that followed
train No. 255 at the time in question ran said train at a
greater rate of speed than was permitted by the ordi-
nance of the city of Belleville, and did not have said
train under control, as required by the rules of the com-
pany, such neglect and failure, upon the part of the ser-
vants in charge of said train, would not entitle plaintiff
to recover in this case, unless you further believe that
such failure to comply with said ordinance and rules of
the company with reference to the speed of said train
amounted to willful and wanton misconduct on the part
of such servants.

5. "The court instructs the jury that what is meant
by willful and wanton misconduct is such conduct as
amounts to an intentional wrong, or of such a reckless
character, as shows that the person or persons, guilty
of such misconduct, were at the time acting in such a
manner, as shows that they had an utter disregard for
the safety and lives of other persons."

In its own instructions, the appellant thus defines
willful and wanton conduct as being conduct "of such a
reckless character, as shows that the person or persons
guilty of such misconduct were at the time acting in such

a manner as shows that they had an utter disregard for the safety and lives of other persons." A careful examination of the testimony in this case will reveal the fact that there was sufficient evidence, tending to prove such wanton and willful misconduct on the part of the servants in charge of these two trains, as to justify a submission of the question to the jury; and, of course, the finding of the jury is conclusive upon the court.

As has already been stated, freight train No. 255, in the caboose of which the deceased had taken passage and had gone to sleep, left the city of East St. Louis at 12:40 and reached the depot in the city of Belleville at 3:20. It remained stationary at the depot for twenty minutes, and until the hour of 3:40 in the morning of January 12, at which time the collision occurred. This train No. 255 was a regular, or time-table, train, and was entitled to the right of way.

Another freight train, called the "extra" train, left the city of East St. Louis at three o'clock on the morning of January 12, and reached the depot in the city of Belleville upon the same track, on which freight train No. 255 stood, and collided with the latter train at 3:40. This extra train consisted of thirty-four cars, and was drawn by two engines. Nineteen of the thirty-four cars were equipped with air-brakes. The engineer, Pope, who was in control of this extra train, knew, when the train left East St. Louis at three o'clock in the morning, that freight train No. 255 had preceded his train, and was traveling on the same track, and going in the same direction, but he had no knowledge where train No. 255 was. It must have been known, when the extra train started from East St. Louis, or ought to have been known, in the train dispatcher's office, that train No. 255 had not yet reached Belleville. Although the time, usually consumed by a freight train in the journey from East St. Louis to Belleville, was one hour, yet this extra train was traveling so rapidly that it reached the depot in Belleville,

where the collision took place, within forty minutes from the time it left East St. Louis, although it made two stops on the way, one at what is called the "belt," and the other for the purpose of taking on coal. The proof shows that, under the ordinances of Belleville, freight trains were forbidden to travel faster than six miles an hour, and that this fact was known to the engineer of the extra train. Yet that train, when it reached the western limits of the city of Belleville, and after it entered the limits, was traveling at the rate of thirty miles per hour, with two engines and thirty-four cars. The population of the city of Belleville is twenty thousand inhabitants. It is 4157 feet from the Belleville and Southern depot controlled by appellant, where this collision occurred, to the western limits of the city of Belleville, which is in the direction of the city of East St. Louis. From the western limits of the city to this depot there is an exact fall in grade of 39.58 feet. At what is called Centreville avenue, at a distance of 1523 feet west of the depot, there is a sharp curve, and, on account of this curve and the houses adjacent thereto, it is impossible to see a train at the depot until this curve is reached, and there is a fall in the grade of one foot to every 100 feet from that point to the depot. When the extra train reached this curve, which was only 1523 feet from the depot, it was traveling at the rate of twenty to twenty-two miles an hour. Not until it reached this point did the engineer, Pope, see the red light in the darkness of the night upon the rear end of train No. 255, which stood at the depot. He then attempted to curb the speed of the train, but was unable to lessen its speed to any considerable extent. Accordingly, when the extra train struck train No. 255 at 3:40 A. M., the former was traveling at the rate of fifteen miles per hour. It took only thirty-five seconds to go from the curve to the depot. The engineer on the extra train, Pope, seeing the collision inevitable, leaped from the engine, and saved his life. The train was traveling

at such a rapid speed that, when it struck train No. 255, the thirty loaded cars of the latter train were knocked forward four or five lengths, and the extra train telescoped or went through the caboose and five loaded cars, and the front engine of the extra train, when it finally came to a stop, was standing on its rear wheels. Wing, who was asleep in the caboose of the train, was killed instantly. Not only was the extra train traveling at a greater rate of speed than was allowed by the ordinances of Belleville, to-wit, six miles an hour, but it was traveling in violation of the rules of the company, which were well known to the engineer operating the train. One of those rules was as follows: "All second and inferior class trains, including extras and following sections of first-class trains, must approach time-table stations under control, expecting to find main track occupied. This does not excuse trains, when detained at stations, from flagging, as provided in rules 96 to 99, inclusive." Another rule of the company was as follows: "Second and inferior class trains must run carefully through the yard limits at East St. Louis and Belleville, expecting to find the main track occupied. In case of accident the responsibility rests with the approaching train." The extra train here was a second and inferior class train. Belleville was a time-table station, and the engineer of the extra train found the main track occupied by freight train No. 255. The rules of the company required him to run his train carefully through the yard limits at Belleville upon the theory that the main track would be occupied. Instead, however, of running his train carefully, and with the expectation of finding the main track occupied, he was running it for a long distance within the city limits at the rate of thirty miles an hour in the darkness of the night, and when he reached the distance of 1523 feet from the depot, was running at the rate of from twenty to twenty-two miles an hour, and thereafter at the rate of fifteen miles an hour. Not only did the engineer on the

extra train know the rules above mentioned, and the ordinances of the city limiting the speed of the train, but he knew that there was a steep down-grade from the city limits to the depot, and that there was a sharp curve at Centreville avenue 1523 feet west of the depot, and that a train at the depot could not be seen even in the daytime until Centreville avenue was reached.

As to the servants of appellant, who were in charge of train No. 255, the following state of facts is shown by the evidence: Carnes, the conductor of this train, knew before he left the city of East St. Louis at 12:40 on the morning of January 12, that this extra train was to leave East St. Louis at 2:30 o'clock on that morning. As a matter of fact, the extra train did not leave East St. Louis until three o'clock. When train No. 255 arrived at the depot in Belleville at 3:20 in the morning, Carnes, the conductor, knew that an extra train was to leave East St. Louis at 2:30, and that in the ordinary course of travel it would reach the depot at Belleville at 3:30, in one hour. He was told by the trainmaster at East St. Louis that this extra train would leave that city at 2:30 A. M. He knew, as well as Pope, that there was a sharp curve 1523 feet west of where the caboose was standing, in which the deceased, Wing, was sleeping, and he knew that his train, No. 255, could not be seen by the extra train, coming behind it, until the latter reached the curve, and knew, moreover, that there was a very steep decline in the grade from the western limits of the city to the depot, but, notwithstanding all this, no effort was made to flag the oncoming extra train. There was a rule of the company, which required a flagman to be sent back 3600 feet when a train was detained at a depot ten minutes. In other words, as stated by the Appellate Court, "the rules of the company provide that, when a train is detained at a station for more than ten minutes, where the rear of the train cannot be plainly seen from a train moving in the same direction for a distance of one-half

mile, a flagman must go back a distance of 3600 feet and protect the train."

When train No. 255 arrived at the depot in Belleville at 3:20 A. M., Carnes, the conductor, and W. E. Ring, the rear brakeman, were in the caboose with the deceased, the latter being asleep. Carnes, the conductor, said to Ring, "Now, Ring, we have been a long time out of East St. Louis, and there was an extra ordered to leave there at 2:30. Keep your eyes open." And the brakeman replied, "All right." After the conductor made this remark to rear brakeman Ring, he got on top of the train and went forward. He went into the office to get orders, and the engineer went to sign the register. Train No. 255 remained longer than ten minutes at the depot. It remained twenty minutes, to-wit, from 3:20 A. M. to 3:40 A. M., and the engineer expressed the fear that his engine would not be able to move the train. Yet, notwithstanding this lapse of time, the rear brakeman did not go back to flag the oncoming extra train, nor give it any notice that train No. 255 was standing upon the track at the depot. The conductor failed to see that the brakeman performed the duty, thus enjoined upon him by the rules of the company. If the extra train had been flagged in accordance with the rule of the company, the accident unquestionably would have been avoided. The conductor and brakeman and engineer in control of train No. 255 knew all the facts that have already been stated in regard to the impossibility of seeing a train at the depot from any point westward distant farther than 1523 feet, and they also knew that there was a down-grade rendering it difficult to suddenly stop a long train. The conductor, and Ring, the brakeman, also knew that Wing, the deceased, was asleep in this caboose, and must have known that he was liable to be killed in case the extra train collided with No. 255, and yet, notwithstanding all this knowledge, nothing was done towards flagging the extra train, and thereby trying to prevent a collision.

Under the state of facts here detailed, we are unable to say that there was no evidence, tending to show such wanton and willful misconduct, as the jury were required to find in the given instructions, in order to justify a recovery by the appellee. Certainly, in the language of the instruction asked by the appellant and given for it by the trial court, the servants of appellant, who were in control of these trains which collided, "were at the time acting in such a manner as shows that they had an utter disregard for the safety and lives of other persons."

*Third*—It is claimed by appellant that the deceased, Wing, was a fellow-servant with the employes of appellant in charge of the trains in question, and that for that reason appellant cannot be held liable. This objection appears not to have been made upon the trial in the court below, and no instruction was asked by appellant, or given by the court, embodying this theory of the case. Aside from this, however, it cannot be maintained that Wing was a fellow-servant of the employes in charge of the trains, for the reason that he was not at the time of the accident working for the appellant, but was riding on the train on his own business.

Certain authorities are referred to by counsel for appellant, which hold, as it is claimed, that an employe of a railway company, who is furnished free transportation to ride to and from his work, or, under the custom of the company, is carried free upon its trains to and from his work, is a fellow-servant with the employes of the company, who are engaged in operating the train. Here, however, freight train No. 255 was not carrying Wing while he was engaged in the work of appellant, but was taking him to his home to visit his family after his work for the appellant had ceased. Where a person in the employ of a railroad company travels back and forth from his home to the place, where his services to the company are rendered, on the cars of the company, and his transportation free of charge constitutes a part of

his contract for service, he is, while so traveling, not a passenger, and cannot recover for the injuries received on account of the negligence of the train crew, because he is a fellow-servant of the train crew, and assumes all the risks which they assume. But no such state of facts exists here. A shoveler of snow, while going to his work upon a train engaged in the work of removing snow from the track, was injured by the overturning of the car, in which he was riding, through the negligence of the conductor, and, in such case, might be regarded as a fellow-servant with the conductor of the train crew. But, in such case, he and the train crew were both engaged in the same work for the company, the one in the work of shoveling snow, and the other in the work of removing the snow from the track. So, where a laborer, while riding on a gravel train to his place of labor, was injured by a collision caused by the negligence of the company's servants in charge of the train, he was held to be a fellow-servant with the train crew; but, in such case, he and the train crew were both engaged in a common service in behalf of the company. No such state of facts exists in the case at bar.

On the contrary, in the case of *Ohio and Mississippi Railroad Co.* v. *Muhling*, 30 Ill. 9, we said (p. 23): "The evidence shows that defendant in error, when he received the injury, was going from his residence to Trenton or Summerfield, to purchase flour. He was in the pursuit of his own business, and not that of the company. Whatever might have been his former relations with the company, he was then engaged in his own business. He was at that time in the situation of any other stranger to, or passenger upon the road, liable to no greater burthens, nor entitled to more privileges, than any other passengers similarly situated. He had no control over the running of the train, was not then engaged in the business of the company, and was, as far as this record discloses, free from all negligence, and was in nowise responsible

for the injury, nor did his connection with the road in the remotest degree contribute to the misfortune."

*Fourth*—Counsel for appellant complain of certain remarks, made to the jury, in his address to them, by counsel for appellee. In these remarks counsel for appellee stated to the jury that appellee would submit no instructions to them, but that the instructions, which would be read to them, were those, which had been asked by the appellant. This statement was literally true, but it was unnecessary to make it to the jury, and, when the attention of the court was called to it by counsel for appellant, counsel for appellee was directed to confine his argument to facts within the record. Counsel for appellee then said to the jury: "It is the sworn duty of the jury to consider the instructions offered, for the reason that, when passed upon by the court, and read to you by the court, they are the law governing the case, and they should be followed by the jury." It seems to us that this was a perfectly fair statement on the part of counsel for appellee, and that appellant could have suffered no injury from any remarks made by counsel for appellee upon this subject.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*