### East St. Louis Connecting Railway Company v. Jesse Meeker.

1. INSTRUCTIONS—*when inaccuracies in, will reverse.* In a close case it is important that the jury should be correctly instructed, and if in such a case inaccuracies appear which might have misled the jury either in finding a verdict or in fixing the amount thereof the court should not hesitate to set aside a judgment based on such a verdict, especially where the amount of damages awarded is large.

2. INSTRUCTION—*when, upon right of recovery, erroneous.* An instruction which substantially tells the jury that they should find for the plaintiff if they believed from the evidence that he has

proved his case as alleged in any count of his declaration, is erroneous, where several of such counts were based upon an allegation of wilfulness or wantonness, and such charge was not sustained by the proof.

Action on the case for personal injuries. Error to the City Court of East St. Louis; the Hon. W. J. N. MOYERS, Judge, presiding. Heard in this court at the August term, 1904. Reversed and remanded. Opinion filed March 17, 1905.

J. M. HAMILL, for plaintiff in error.

DANIEL McGLYNN, M. W. SCHAEFER, and M. W. BORDERS, for defendant in error.

MR. PRESIDING JUSTICE HIGBEE delivered the opinion of the court.

Jesse Meeker, the defendant in error, while in the employ of the East St. Louis Connecting Railway Company, on April 10, 1903, received severe personal injuries for which he brought suit against the company, and obtained a judgment for $25,000, and the cause was brought to this court by the company, by writ of error.

The proofs showed that Meeker had, at the time he was injured, been in the employ of the railway company, engaged in switching cars in its switch yards at East St. Louis, for about six months. The first three months of that time he was an extra man and only worked part of the time, but the last three he was employed regularly. His work was at all times at night, but this was only the second night in which he had been engaged in the particular work he was doing when injured. He was then working with a switching crew engaged in distributing freight cars over the different switch tracks. The crew consisted of a foreman named Dwire, an engineer, fireman, two switch tenders and Meeker, who was what was known as a "pin puller." It was Meeker's duty to pull the coupling pins and cut the cars loose as they were being run over the lead track to the different switches. The railway company's switch tracks at the place in question, ran north and south and at the southern extremities connected with the main or lead track,

running northwest and southeast. At the southern extremity of this switch yard a single track led south, crossing Cahokia creek, a few feet further on upon a trestle. In carrying on the work of switching, each car was marked in a way to indicate which switch it was to go on. The cars so marked were then pushed ahead of the engine toward and over the lead track with such rapidity that when the speed was suddenly checked by the application of brakes upon the engine, sufficient momentum had been acquired by the head car, which had been previously uncoupled from the train, to go upon the switch without the application of other force. This operation was called "kicking" the cars. The usual method employed by the company in its switch yards to uncouple the cars, was to cause the pin puller to get upon the moving cars and when sufficient speed had been obtained, pull the coupling pin between the car to be detached from the rest of the train. The foreman would then signal the engineer to apply the brakes and the car detached would go forward to the switch prepared for it by a switchman. The cars were equipped with what are called "Janney automatic couplers," and when connected were about four feet apart. They were uncoupled by pulling a lever at the end of the car, at the bottom and about one foot in from the side. The lever, which was perpendicular, was attached to a horizontal rod which operated the coupler. On the side of each car, near the end, was an iron stirrup and hand-hold.

On the night of the accident, about 10:30 o'clock, the engine took seven cars from track No. 9 on the east side of the yards, north of Cahokia creek, and pulled them south beyond the end of the lead switch and across the trestle over the creek, intending to push them back and "kick" the several cars on the proper switches. They were all box cars, except the second one from the north end, which was a coal car. The night was dark with drizzling rain and the headlight of the engine came close up against the end of a box car. The car at the north end was to be run in on track No. 6, which was some distance west of track No. 9,

and the coal car next to it was to be let in on a different track. As the train started north Meeker got on the coal car while it was still south of the trestle and standing on the iron stirrup on the east side of the car, tried with his left hand, to pull the lever on that car. At that time the engineer was in his cab on the east side and Dwire, the foreman, was standing a few feet north of the second switch on the east side of the track. Henneberry, one of the switchmen, was at the third switch north of the bridge, standing on the west side of the track. The switches were some 60 to 70 feet apart. After pulling at the lever several times, without effect, Meeker discovered that it was broken and as he got across the trestle, called to Dwire, "This old thing is broke," and he claims that the foreman called back to him "hip over," which expression was shown by the evidence to mean to get on the other side of the car. Meeker thereupon went over to the other side of the car. The lever to be used in coupling the cars on that side, was not on the coal car, but on the end of the box car, just north of it. The tail gate of the coal car next to the box car, was flat on the car floor, but the upright wooden stanchion that the gate closed against, was standing, and Meeker taking hold of it with his right hand stooped down and with his left hand took hold of the lever on the opposite car to make the uncoupling. He pulled the lever, when the cars jerked suddenly and he fell headlong upon the tracks. The jerking or jarring motion of the train was caused by the application of the brakes made by the engineer in response to a signal given by Dwire. Meeker fell about three feet from Henneberry, who when he discovered Meeker on the tracks, called to Dwire that Meeker had fallen under the cars and Dwire gave the signal to the engineer to stop. Meeker received injuries which later resulted in the amputation of both legs and the left arm.

The declaration contained six counts, but at the close of plaintiff's evidence, he dismissed as to the third and sixth counts. The negligence alleged in the first count, was that of the foreman in signalling the engineer and causing him

East St. Louis Connecting Ry. Co. v. Meeker.

suddenly to check the motion of the locomotive and cars. In the second count the negligence charged was the order of the foreman to Meeker "to cross over said cars while in motion and uncouple said cars from a certain car on the opposite side, while in motion." The fourth count was the same as the first and the fifth is the same as the second, except that said fourth and fifth counts charged wilfulness and wantonness on the part of the foreman.

The plaintiff introduced as witnesses in addition to himself, the engineer of the train, the brakeman Henneberry and a physician, the latter of whom testified only concerning Meeker's injuries. No witness was introduced on the part of the defendant, but the attorney for the defendant read in evidence, by consent of plaintiff, an affidavit which stated that the foreman Dwire was unexpectedly absent; that defendant expected to prove by Dwire that he gave no order to plaintiff to hip over or cross over the car to make the uncoupling, and had no conversation with him and gave him no directions as to the said uncoupling; that Dwire was standing at the side of the track and saw plaintiff on the coal car as the train passed north; that he did not know the coupler was out of order and did not know that Meeker was obliged to cross over the car in order to make the uncoupling; that it was Meeker's duty, when he ascertained the coupler was out of order, to give a signal to stop and not to proceed any further with the uncoupling until the cars came to a stop. In regard to the giving of the order to cross over the car Meeker was corroborated by the witness Henneberry, who said that just before the time Meeker fell, witness heard somebody say "hip over," but that he did not know who it was.

We are of opinion that the question whether the plaintiff made out such a case by the evidence introduced by him, as to show a right of recovery upon the facts, was an exceedingly close one. In such a case it is important that the jury should be accurately instructed and should inaccuracies appear therein which might have misled the jury either in finding a verdict or in fixing the amount of dam-

ages, the court should not hesitate to set aside the judgment based on such verdict, especially so in a case like this where the amount of damages awarded is so very large.

By the first and second instructions given for the plaintiff, the jury were told if they believed from a preponderance of the evidence, plaintiff had proved his case as alleged in one or more counts of the declaration, they should find in his favor. The fourth and fifth counts of the declaration charged wantonness and wilfulness, and said instructions gave the jury a right to find in favor of plaintiff upon those counts of the declaration as well as the others. If Dwire was guilty of wilfulness and wantonness, charged in the fourth and fifth counts, in bringing about the injury to Meeker, then the latter was excused from the exercise of ordinary care on his part. Whether the circumstances were such as to excuse Meeker from exercising such care, was very important in this case, where the undisputed evidence presents a state of facts, showing that the question of due care was a very close one. That they considered the subject of wilfulness is shown by the facts that among the special findings returned by them, was one stating that Dwire knew that Meeker was in such a position when he gave the signal to slacken the speed of the train, that the reduction of the speed would be likely to injure Meeker. Such a finding could only be returned upon the theory that Dwire was guilty of wilful and wanton conduct in giving the signal referred to and such a state of facts, if proven, would show as great wilfulness and wantonness on the part of Dwire as if he had deliberately placed Meeker under the wheels of the car in order that he might be run over.

In his brief defendant in error says: "This case went to the jury on the question of wilfulness and we insist in all earnestness that there is an abundance of evidence to sustain that charge." There is no proof, nor is it contended by defendant in error, that Dwire when he gave the signal, was moved by a desire purposely to injure Meeker. Nor do we find that the proofs in the record tend to show that Dwire actually knew that Meeker was in such a position when he

gave the signal to slacken the speed of the train, that the reduction of speed would be likely to injure him. It is true the act of Dwire in giving the signal was wilful, in that he intended to give the signal, but there is no evidence tending to show that it was wilful in the sense that he desired to injure Meeker or that he actually knew that the probable result of his giving the signal would be to injure Meeker.

It is contended however, that the action of Dwire in giving the signal was so grossly negligent as to import wilfulness and wantonness on his part. In I. C. R. R. Co. v. Leiner, 202 Ill. 624, our Supreme Court indorsed an instruction stating, "What is meant by wilful and wanton misconduct is such conduct as amounts to an intentional wrong or of such a reckless character, as shows that the person or persons guilty of such misconduct, were at the time acting in such a manner as shows that they had an utter disregard for the safety and lives of other persons."

In L. S. & M. S. Ry. Co. v. Bodemer, 139 Ill. 596, in discussing the question as to what is such gross negligence as to evidence wilfulness, it is said: "It is 'such want of care and regard for the rights of others as to justify the presumption of wilfulness or wantonness.' It is such gross negligence as to imply a disregard of consequences or a wilfulness to inflict injury."

The proof shows that Dwire could not see Meeker in the position he occupied at the time of the injury, so that in order to justify a finding that Dwire gave the signal in utter disregard of the safety and life of Meeker or with a wilfulness to inflict injury upon him, we assume that Dwire knew that Meeker was occupying an unsafe position upon the car at the time the signal was given, and that the result of the signal would be to injure Meeker or that Dwire, knowing Meeker was in a dangerous position, gave the signal, not caring whether the result would be to kill or injure Meeker or not. But what was there in the proofs to warrant the assumption that Dwire had knowledge of the dangers of Meeker's position? The cars were provided with iron stirrups and hand-holds by the use of which, it

3

appears from the evidence, the pin puller could have pulled the lever with safety. How can it be assumed that Dwire knew that Meeker was not using the stirrup and hand-hold, but was standing on his feet on the flat-car with his right hand on a wooden stanchion he could not reach around with his fingers, and in that position with his head down between the cars, and with his lantern in his left hand was, with the same hand, attempting to pull a lever near the bottom of a car four feet away? It certainly was not shown to be dangerous for Meeker to walk from one side to the other of the flat-car, while the same was in motion. On the night before Dwire had given Meeker the same order to "hip over" when a lever was out of order and Meeker had gone to the opposite side of the car and made the uncoupling in safety. It is claimed that Dwire gave the signal too soon after Meeker had crossed the car. It appears however, that Meeker had had time to give the lever a pull before the jar came. Meeker testified that he gave the lever one jerk and by the time he could give another, the jar came and he fell down upon the track. The first jerk upon the lever had made the uncoupling and the box car went ahead. There was however, a way of resetting the lever, which was probably what Meeker contemplated doing by another jerk. Meeker testified there was no system of signals, under the custom of the yards, by which the pin-puller notified the foreman that a car had been uncoupled; that the men pulling the pins never gave any signals at all; that the foreman could see the lamp on the side of the car and know that the pin puller was holding the lever up; that Dwire was bound to know that the uncoupling had not been made because he did not see Meeker's lamp; that if Dwire had waited until he, Meeker, got back to the other side of the car, he would have seen the lamp and known that the cut had been made. It appears therefore, that it was left to the foreman's observation to determine when the cut had been made and he was not required to wait for a signal. Whether Dwire in the hurry of the moment, used the best possible judgment in giving the order to the engineer to slacken the train at

the time he did, is not the question presented us and upon that we express no opinion but we are of opinion that the proofs wholly failed to show, nor did they tend to show, such a state of affairs as would warrant a finding that Dwire was guilty of such gross negligence in giving the signal as to show entire disregard for the life or safety of Meeker or a willingness to inflict injury upon him.

The charge of wilfulness contained in the fourth and fifth counts of the declaration, was therefore not sustained by the proofs, and the court below erred in giving instructions, which authorized the jury to find for the plaintiff under those counts.

The judgment of the Circuit Court will be reversed and the cause remanded.

*Reversed and remanded.*