(110 App. Div. 61.)

## In re MALLON'S ESTATE.

### In re HOWARD.

(Supreme Court, Appellate Division, Second Department.   December 29, 1905.)

TRUSTS—LIABILITY OF TRUSTEE—CO-TRUSTEE'S MISAPPROPRIATION.

A trustee under a will exempting him from liability "for losses occurring without his own willful default," though knowing that his co-trustee had collected the rents of the estate and had converted the same to his own use to an amount equal to nearly a third of the corpus of the estate, permitted the co-trustee to continue to collect the rents, without attempting to control the receipts, and the co-trustee misappropriated them. *Held*, that the trustee was personally liable for the amount misappropriated because he intentionally disregarded the rules regulating the actions of prudent men in conducting their own business; the exemption clause merely protecting the trustee from losses occurring through his carelessness or bad judgment.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, § 347.]

Appeal from Surrogate's Court, Kings County.

In the matter of the judicial settlement of the account of James Howard, as executor and trustee under the will of Peter Mallon, deceased. From a decree charging a loss against the executor and trustee personally (89 N. Y. Supp. 554), he appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, RICH, and MILLER, JJ.

Fredric W. Frost, for appellant.

M. F. McGoldrick, for respondent.

JENKS, J. Howard, the appellant, is the accounting executor and trustee of Mallon, who died in 1893, leaving an estate worth about $100,000, partly in the form of improved real estate that returned monthly rentals. The income of the estate was about $1,000 a month. Mallon gave his estate to Howard and to Ferry, in trust to collect and apply the income to the maintenance of his child and his step-children during the minority of the said child. The trustees were clothed with powers of sale and of investment. Ferry was a real estate agent, and had charge of the collection of the rentals in Mallon's lifetime. After Mallon's death Howard virtually left Ferry with free hand in the financial management of the estate. Ferry collected the rents, and, in fine, was the dominant trustee. But a small part of the income was devoted to the maintenance of the cestuis que trustent. On February 17, 1902, when Howard called upon Ferry for a cheque for $300 to pay interest, he was then told by Ferry that there was not $100 in the bank, that he (Ferry) was in debt to the estate, and that he owed it more than $30,000. When Howard asked for an explanation, Ferry answered that "he could not talk about it." Ferry said then, or shortly thereafter, that he had some property which he would turn over to the estate to make up his deficit. After February 17, 1902, Howard signed a contract for a transfer of a piece of realty belonging to the estate, gave Ferry $100 received on account of the sale, and permitted Ferry to collect $1,335 rentals for March and $75 on account of interest, which sums were misappropriated by Ferry. The decree charges

these moneys personally against Howard, who insists that he was indemnified against such liability by this provision of the sixth clause of Mallon's will:

"And I exempt every trustee of my will from liability for losses occurring without his own willful default."

The learned surrogate found that the defalcation in question "was made possible and occurred by reason of the willful default of the said James Howard in the performance of his duties as such executor and trustee." I think that he is right. Howard permitted Ferry, after Ferry had acknowledged without explanation that he had looted the estate to an amount equal to nearly one-third of the corpus, to continue in the same charge and control thereof as theretofore, although he knew perfectly well that Ferry could collect the monthly rentals and could divert them as theretofore. For aught that appears, he did not attempt to check Ferry or to act in concert with him in such collections or in any way to secure even joint control over the cash receipts as they were collected. Perry on Trusts, at section 418, says:

"Though a trustee may join in a receipt without receiving any of the money, and may not be liable or answerable for it, yet he may be responsible for the whole, though he receives none. Thus, if knowing that his co-trustee has no character or credit, and is unfit to manage the trust funds, he suffers the money to be received by him, or to remain in his hands, he will be answerable, or if he receives it himself, on the ground that he has committed a breach of trust in not using due care and diligence."

See, too, Matter of Niles, 113 N. Y. 547, 21 N. E. 687.

Whatever the testator contemplated, he certainly did not contemplate that either trustee would disregard every consideration that would move a man of ordinary care and prudence in his own affairs. And so he did not intend, as I read his will, to absolve formally in advance either trustee for whatever he did or did not do, however gross the breach, provided the trustee did not cum malo animo set out to rob the estate or to suffer his fellow to rob it. I think that the indemnity clause protected the trustee from losses which might be ascribed justly to his fall below the standard prescribed by law for trustees, to his improvidence, or carelessness or bad judgment and the like, but not from such purblind folly as Howard showed after he learned of his fellow trustee's maladministration, which must have convinced any man who took second thought either that Ferry was grossly incompetent or utterly dishonest, for it must be remembered that Ferry would not or could not explain this disappearance of $30,000. I think that Howard must be held liable, because in the eye of the law he "intentionally disregarded the rules which control and regulate the actions of prudent and careful men in conducting their own business affairs." This is the expression of the court in Crabb v. Young, 92 N. Y. 56, 65, considering the phrase "willful default." See, too, Matter of Olmstead, 52 App. Div. 575, 518, 66 N. Y. Supp. 212, 214, affirmed 164 N. Y. 571, 58 N. E. 1090. I think that in such a case the word "willful" but implies an intentional act of commission or of omission. Crabb v. Young, supra; Bouvier; Stratton v. Cent. City Horse Ry. Co., 95 Ill. 25; Bindbeutal v. Street Railway Company, 43 Mo. App. 463, 470. In Words and Phrases Judicially Defined, p. 7479, it is said:

"'Willful' is a word of familiar use in every branch of the law, and it amounts to nothing more than this: that the person knows what he is doing, and intends to do what he is doing, and is a free agent. Illinois Cent. R. Co. v. Leiner, 67 N. E. 398, 400, 202 Ill. 624, 95 Am. St. Rep. 266 (citing Odin Coal Co. v. Denman, 185 Ill. 413, 57 N. E. 192, 76 Am. St. Rep. 45)."

In State v. Preston, 34 Wis. 675, 683, the court say:

"The word 'willfully,' as used to denote the intent with which an act is done, is undoubtedly susceptible of different shades of meaning or degrees of intensity, according to the context and evident purpose of the writer. It is sometimes so modified and reduced as to mean little more than plain intentionally, or designedly. Such is not, however, its ordinary signification when used in criminal law and penal statutes."

And the court also cites and approves the language of the court in United States v. Three Railroad Cars, 1 Abb. U. S. 196, Fed. Cas. No. 16,513, as follows:

"The first of these words does not, in common parlance, or in legal construction, necessarily and per se, imply wicked purpose or perverse disposition, or, indeed, any evil or improper motive, intent, or feeling; but the second is ordinarily used in a bad sense to express something of that kind, or to characterize an act done wantonly, or one which a man of reasonable knowledge and ability must know to be contrary to his duty."

In Lewis v. Great Western Railway Co., 3 Q. B. Div. 195, the court considered the force of the phrase "willful misconduct"; and Cotton, L. J., said (page 213):

"Now, I do not think there can be any doubt at all that willful misconduct is something entirely different from negligence, and far beyond it, whether the negligence be culpable, or gross, or howsoever denominated. There must be the doing of something which the person doing it knows will cause risk or injury, or the doing of an unusual thing with reference to the matter in hand, either in spite of warning or without care, regardless whether it will or will not cause injury to the goods carried or other subject-matter of the transaction."

And Bramwell, L. J., said:

"'Willful misconduct' means misconduct to which the will is a party; something opposed to accident or negligence. The misconduct, not the conduct, must be willful. It has been said, and I think correctly, that perhaps one condition of 'willful misconduct' must be that the person guilty of it should know that mischief will result from it. But to my mind there might be other 'willful misconduct.' I think it would be willful misconduct if a man did an act not knowing whether mischief would or would not result from it. I do not mean when in a state of ignorance, but after being told, 'Now, this may or may not be a right thing to do.' He might say: 'Well, I do not know which is right, and I do not care. I will do this.' I am much inclined to think that that would be 'willful misconduct,' because he acted under the supposition that it might be mischievous, and with an indifference to his duty to ascertain whether it was mischievous or not."

In Continental N. Bank v. Bank of the Commonwealth, 50 N. Y. 575, 583, it is said that the word "willful" does not necessarily imply malo animo.

The learned counsel for the appellant quotes from Lewin on Trusts, p. 275, and Perry on Trusts, § 418, note, to the effect that a settlor can so abridge the ordinary duties of trustees as to excuse them from what otherwise would be a breach of trust. He seems to rely upon an English case cited by both of these authors, namely, Wilkins v. Hogg, 3

Giff. 116. In that case Reid, one of the executors and trustees, received and appropriated the proceeds of insurance policies. To a bill filed to fasten personal liability upon the other executors and trustees, they answered that they had suffered Reid to receive the money on the distinct understanding that he would deposit it forthwith in the joint names of the executors and trustees, and that he had reported to them that he had done so. The Vice Chancellor sustained the plea, saying that the defendants had not been guilty of any gross breach of trust, even if their conduct was strictly a breach of trust at all, and that it would not be a true view of the case to say that they committed a breach of trust in allowing the trust fund to be paid to Reid. The testatrix had said that they might safely do what they had done. The indemnity clause read:

"And I declare that such trustee shall be answerable only for losses arising from his own defaults, and not for involuntary acts, or for the acts or defaults of his co-trustees or trustee; and particularly that any trustee who shall pay over to his co-trustee, or shall do or concur in any act enabling his co-trustee to receive any monies for the general purposes of my will, or for any definite purpose authorized by my will, shall not be obliged to see to the due application thereof, nor shall such trustee be subsequently rendered responsible by an express notice or intimation of the actual misapplication of the same monies."

Thus it appears that the case was decided upon the point that the specific part of the indemnity clause in express terms shielded the trustees from any liability for the very act of which complaint was made. The indemnity afforded by the expression "willful default" has been frequently considered in many other cases in the English courts which turned upon the purview of that phrase. Some of them are cited in Perry on Trusts, Lewin on Trusts, and Hill on Trustees. In Langston v. Ollivant, Coop. Chan. Cas. 33, trustees directed to invest the fund in real and personal securities were held liable, for as much as they lent part of the fund to a trader upon his own security. In Fenwick v. Greenwell, 10 Beav. 412, the trustees neglected to obey the direction to transfer the fund from the name of the cestui que trust to their own names, whereby the husband of the cestui was enabled to appropriate the fund. In Brumridge v. Brumridge, 27 Beav. 5, one of the trustees took but formal part in the execution of the trust, but signed receipts which enabled his fellow to embezzle the funds. And Sir John Romilly, M. R., said:

"This clause is constantly brought forward to sanction the misapplication of trust moneys; but until it is provided, by the instrument creating the trust, that the trustee shall be liable for no breach of trust, provided he does not obtain a personal advantage, I shall not consider the clause as giving a trustee the right or liberty of conniving at a breach of trust."

In Dix v. Burford, 19 Beav. 409, the Master of the Rolls, speaking of the phrase "willful default," said:

"The ordinary trustee indemnity clause affords no security to a trustee who neglects to take the steps necessary to secure the fund."

See, too, Drosier v. Brereton, 15 Beav. 221.
The decree is affirmed, with costs. All concur.