James M. MORRISSEY et al., Plaintiffs,

v.

Joseph CURRAN et al., Defendants.

No. 69 Civ. 442.

United States District Court,
S. D. New York.

Oct. 26, 1972.

Duer & Taylor, New York City, for plaintiffs; Arthur E. McInerney, New York City, of counsel.

Bloom & Epstein, New York City, for defendants Curran, Wall and Freedman; Harold Epstein, Robert Milner and Warren Pesetsky, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant Segal; Roy L. Reardon, Melvyn L. Cantor and John W. Ohlweiler, New York City, of counsel.

Surrey, Karasik, Morse & Seham, New York City, for defendant Karchmer; Herman E. Cooper and Carl F. Goodman, New York City, of counsel.

## OPINION

BONSAL, District Judge.

In prior proceedings it has been held that the 1960 constitution of the National Maritime Union of America ("NMU") did not authorize the inclusion of non-officers of NMU in the NMU Officers Pension Plan ("the Officers Pension Plan"), and that NMU was entitled to recover from the Trustees of the Officers Pension Plan all amounts paid by NMU into the Officers Pension Plan for the account of non-officers, plus interest. Morrissey v. Curran, 302 F.Supp. 32 (S.D.N.Y.1969), aff'd in part, rev'd in part, 423 F.2d 393 (2d Cir.), cert. denied, 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970), Segal v. Morrissey, 400 U.S. 826, 91 S.Ct. 52, 27 L.Ed. 56 (1970), on remand, 336 F. Supp. 1107 (S.D.N.Y.1972). Accordingly, on February 18, 1972, judgment was entered in favor of NMU against the Officers Pension Plan in the amount of $674,222.60 (representing $520,283.38 paid by NMU to the Officers Pension Plan for the account of non-officers, plus interest in the amount of $153,939.22), which judgment has been paid. On February 18, 1972, judgment was also entered in favor of the Officers Pension Plan against the defendant William Perry ("Perry"), a non-officer, in the principal amount of $222,200. (the amount of the lump sum pension paid to him), plus interest in the amount of $41,107., or a total of $263,307. This judgment has not been paid. The court has been advised that the Officers Pension Plan has instituted supplementary proceedings to collect the Perry judgment.

By Memorandum filed January 11, 1972, plaintiffs were authorized to "notice a hearing to determine the personal liability, if any, of the defendant trustees [of the Pension Plan], Freedman, Segal and Karchmer, and officers [of NMU], Curran and Wall, to NMU for the monies which the Pension Plan has paid out to non-officers and which it is unable to recoup." The hearing was held, and plaintiffs presented their evidence on April 13, 14 and May 1, 1972. The defendants then moved to dismiss, pursuant to Rule 41(b), F.R.Civ.P., on the ground that plaintiffs had shown no right to relief. By Memorandum filed June 29, 1972, the defendants' motions were granted with respect to the payments made to non-officer employees of NMU other than Perry,[1] and were denied with respect to the payment made to defendant Perry by the Officers Pension Plan on January 16, 1969. On July 12, 1972, the hearing was resumed and the defendants presented their evidence.

Plaintiffs are members of NMU, suing on behalf of all of its members under Section 501[2] of the Labor-Management

---

1. These payments were made as follows:

| Sarah Laderhandler | $9,201 |
| James Tevan | $12,799 |
| Sophia Tevan | $11,561 |
| Irving Brauch | $115,510 |

2. Section 501(a) provides, to the extent here relevant:

"(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and func-

Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 501. Defendants Martin Segal ("Segal"), Abraham E. Freedman ("Freedman") and Leon Karchmer ("Karchmer") are the trustees of the Officers Pension Plan pursuant to an Agreement and Declaration of Trust of December 29, 1952 as subsequently amended. Freedman is also General Counsel of NMU. Defendant Joseph Curran ("Curran") is the President of NMU. Defendant Shannon Wall ("Wall") is the Secretary-Treasurer of NMU.

Freedman became a trustee of the Officers Pension Plan in 1963 when he became General Counsel of NMU. As trustee, Freedman drafts legal documents for the Officers Pension Plan and renders legal opinions to the other trustees.

Segal has been a trustee since the inception of the Officers Pension Plan in 1953, and the Martin E. Segal Company ("the Segal Company"), of which Segal is Chairman of the Board, has administered it. The Segal Company processes pension applications and computes pension benefits. The Segal Company also is the actuary for the NMU Welfare Plan and a pension plan covering the membership of NMU.

Karchmer, an original trustee of the Officers Pension Plan, is a Certified Public Accountant whose firm acts for NMU, the NMU Welfare Plan, the NMU Vacation Plan and the pension plan covering the membership of NMU. Karchmer keeps the books of the Officers

Pension Plan and issues and receives checks on its behalf.

### Statement of Facts with Respect to Perry

Perry had been employed by NMU since 1954, and as Assistant to the President since 1958. On August 2, 1966, he entered into an employment contract with NMU which provided that he would continue in the employ of NMU to serve as Assistant to the President until October 20, 1974. Paragraph 3 of the contract provided:

"In the event that this Agreement or Perry's employment should be terminated, with or without cause, prior to the expiration date hereof . . . Perry shall be entitled to continue to receive his said salary in full, including contributions to the NMU Officers Pension Plan and any other fringe benefits payable to the National Officers as under paragraph 2 hereof, during the balance of the term hereof . . . . In the event, however, of such termination . . . Perry shall have the option to demand and receive at one time . . . an amount equal to the said total salary, *including contributions to the NMU Officers Pension Plan* and any other fringe benefits payable to National Officers which he would have received during the balance of the original term . . . . (Emphasis added.)

Attached at the end of Perry's contract is an undated statement signed by Freedman, Segal and Karchmer, the Trustees of the Officers Pension Plan by which they acknowledged that paragraph 4 [3] of

---

tions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received

by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization."

3. Paragraph 4 provides: ..
 "4. For the purposes of determining Perry's entitlement to participation in and benefits from, the NMU Officers Pension Plan, the parties recognize, understand and agree that Perry shall be deemed to be a 'Participant' in 'Covered Employment' (as defined in the said Plan) during the full period of the original term of this Agreement, and the full

Perry's Agreement "shall be binding upon us and our successors in determining William Perry's entitlement to participation in, and benefits from, the NMU Officers Pension Plan." There is appended at the end of this opinion a copy of the Perry contract and of the statement signed by the trustees. The statement signed by the trustees may have been added on or about August 29, 1966, on which day Freedman, following discussions with Karchmer and Segal, furnished them with his legal opinion, quoted in part as follows:

"It is my considered judgment that Perry would continue as a 'Participant' in 'Covered Employment', even though his services may be discontinued by the union. The contract specifically so provides and must be so construed without any question.

\* \* \* \* \* \*

"It is made crystal clear in the agreement that both the union and Perry agreed that Perry shall be deemed to be an employee of the NMU during the full term of the agreement, including any renewals or extensions. As above indicated, the agreement first of all provides that Perry shall continue in the 'employ' of NMU as Assistant to the President until October 20, 1974.

"Paragraph 1 of the agreement specifically requires the union to pay his salary, contributions to the NMU Officers Pension Plan and fringe benefits during the entire term of the agreement. Paragraph 2 of the agreement pointedly covers the inquiry made by Marty and provides that the payment of salary, contributions to the NMU Officers Pension Plan must be paid to the end of the term, notwithstanding any termination of his services with or without cause prior to the expiration date. Paragraph 3 express-

ly provides that Perry is to be deemed to be a 'Participant' in 'Covered Employment' (as defined in the Plan) during the full term of the original agreement and any extension. Paragraph 4 of the agreement specifically shows that the parties recognize, understand and agree that Perry shall be deemed to be a 'Participant' in 'Covered Employment' as defined in the NMU Officers Pension Plan to the very end of the term of the agreement or any extension notwithstanding anything that might be construed to be to the contrary elsewhere in the agreement, such as a termination of services with or without cause.

"In summary, in consideration of Perry's services to the union, past and future, the union agreed to maintain Perry in its employ at least until October 20, 1974 with full pay and all other benefits until the very end of that term or any renewal thereafter. There is no question but that this is a valid and binding agreement, and Perry's status as a covered employee continues at least until October 20, 1974, regardless of whether his services are discontinued by the union prior to that date. I recommend that the Trustees of the NMU Officers Pension Plan approve and adopt the agreement to the extent that it relates to the NMU Officers Pension Plan."

In May of 1968, the plaintiffs wrote several letters to Wall, Secretary-Treasurer of NMU, demanding that NMU institute suit or other proceeding to recover, on behalf of NMU, all monies contributed to the Officers Pension Plan with respect to non-officers, including the "Assistant to the President" (Perry). These letters were sent by certified mail on May 17 and May 23, 1968. Wall received the letters, made copies of them available to Curran and Charles Sovel, Freedman's law partner, and after

---

four-year period of each renewal or extension thereof, notwithstanding anything to the contrary contained in para-

graph 3 or any other provision of this Agreement."

checking the NMU constitution and conferring with Sovel, Wall decided not to institute suit on behalf of NMU. There is no evidence that plaintiffs were notified. Curran testified that copies of plaintiffs' letters were handed to him but that he paid no attention to them as he considered them "propaganda." There is no evidence that plaintiffs' letters were brought to the attention of Segal and Karchmer.

In a letter dated November 4, 1968, Mr. De Novellis, an administrator of the Officers Pension Plan at the Segal Company, informed Perry, at the request of Milton Breit, the controller of NMU, that as of October 20, 1974 the lump sum equivalent of his Regular Pension Benefit would be $222,200.

On December 18, 1968, Curran sent a memorandum to Breit instructing him to prepare a check in the amount of $41,250.01 to be paid to the Officers Pension Plan for Perry's account. The memorandum read in part, as follows:

> "This check represents the monies due in accordance with the employment contract agreement with the National Maritime Union of America and William Perry. The computation of the amount of $41,250.01 is based upon Mr. William Perry's current regular and vacation pay and is for the period December 1, 1968 thru and including October 20, 1974 multiplied by the current percentage rate of contribution which is 26%."

On the following day, December 19, NMU forwarded a check, signed by Curran, to the Officers Pension Plan in this amount for the account of Perry, which was in addition to NMU's regular contribution due at that time.[4]

Karchmer photostated the check before depositing it as he had not previously received a payment of this kind.

Karchmer testified that the check "wasn't accompanied with a regular routine report," but he believed that he received Curran's memorandum or other substantiating data from Breit.

### January 16, 1969

Curran testified that at 9:30 a. m. he called Perry into his office and fired him, and that he immediately notified such officers as were available. He said that not many officers were available since they were conducting a Union election.

Curran testified that after firing Perry, he instructed Freedman's partner Sovel (Freedman being in Philadelphia that day), to examine Perry's contract and to see what Perry had coming to him. As Wall, the Secretary-Treasurer, was not available, Curran instructed Controller Breit "to prepare everything that was coming to him" [Perry]. At some time during the same day, Perry was handed a check signed by Curran, in the amount of $104,595.16, which, according to Curran, covered Perry's wages, severance pay, vacation pay, and "all other monies due him" through October 20, 1974. Curran testified that he had first fired Perry a month before when he directed that the $41,250.01 be paid the Officers Pension Plan for Perry's account, but that he had changed his mind when Karchmer interceded on Perry's behalf.

Freedman testified that at about 9:30 a. m. on January 16, 1969, Sovel telephoned him in Philadelphia and told him that Perry had been fired. Apparently, by 10:00 a. m. Perry's application for pension benefits was prepared by Breit and delivered to Segal, because Freedman testified that at about 10:00 a. m. Segal telephoned him in Philadelphia asking for his legal opinion. Freed-

---

4. Article II, Section 2 of the amended Agreement and Declaration of Trust between NMU and the Trustees of the Pension Plan provides that NMU shall make quarterly payments to the Pension Plan equal to 26% of the compensation paid by NMU to the participants in the Pension Plan. There is no provision in the amended Agreement and Declaration of Trust authorizing special payments, and the Officers Pension Plan did not maintain separate accounts for each participant.

man testified that he immediately called Sovel. After satisfying himself that the $41,250.01 had been paid to the Pension Plan (which the record indicates was done on December 19, 1968), Freedman dictated his legal opinion [5] over the telephone to Sovel and authorized Sovel to sign his (Freedman's) name to it and deliver it to Segal.

Segal testified that after he learned Perry was leaving NMU he telephoned Freedman and asked him whether the period of service to be credited in computing Perry's lump sum pension benefit was to be through 1974. Freedman said it was, and promised to send Segal an opinion letter. In his deposition, Segal testified that this conversation occurred prior to January 16, but at trial he testified that the conversation occurred on the morning of January 16, 1969. Segal also testified that he did not know at the time of the conversation that Freedman was in Philadelphia.

Apparently, before the lunch hour on January 16, 1969, the Freedman opinion letter was delivered to the Segal Company, Perry's pension application was processed and written approval had been given by Segal and Freedman (Sovel signed Freedman's name as trustee). Freedman explained that he authorized

5. Freedman's legal opinion reads as follows:

ABRAHAM E. FREEDMAN

COUNSELLOR AT LAW AND PROCTOR IN ADMIRALTY

36 SEVENTH AVE., NEW YORK, N. Y. 10011

OREGON 5-4211

| CHARLES SOVEL | PHILADELPHIA, PA. OFFICE |
|---|---|
| STANLEY B. GRUBER | FREEDMAN, BOROWSKY AND LORRY |
| NED R. PHILLIPS | CHESTNUT STREET AT FIFTH |
| EDWARD M. KATZ | WALNUT 5-8400 |
| MARTIN L. KATZ | |

January 16, 1969

Mr. Martin E. Segal
Martin E. Segal Company
730 Fifth Avenue
New York, New York 10019

Re: William Perry

Dear Mr. Segal:

You have posed certain questions in connection with the retirement of Mr. William Perry as Assistant to President Joseph Curran of the National Maritime Union. The following are my answers to your inquiries:

1) Is Mr. Perry entitled to credit for covered employment for the period through October 20, 1974?

Yes, based on his contract with the Union, dated August 2, 1966, and pursuant to which contributions have been made by the Union to the Plan for the period through October 20, 1974.

2) In determining the amount of his pension benefits what attained age of William Perry is to be used?

His attained age as of October 20, 1974.

3) Is Mr. Perry entitled to receive immediate payment of the benefits which are payable to him in accordance with the answers to the above questions?

Yes.

I trust that the foregoing answers your inquiries.

Mr. Martin E. Segal
January 16, 1969
Page two

With best personal regards, I am,

Sincerely,

(s) Abraham E. Freedman

Abraham E. Freedman

Sovel to sign his name after Sovel told him, "Mr. Perry is anxious to get it through [the payment of $222,200] and everybody here [NMU] is anxious to get finished with the thing . . . ." (Transcript p. 305).

Karchmer testified that Perry, accompanied by Sovel and two other gentlemen associated with NMU, appeared in his office after lunch and presented him with the pension application. Karchmer testified that before approving the application he carefully studied Freedman's opinion letter because the payment to Perry was the first of its kind. Since there were insufficient funds on hand in the Officers Pension Plan's checking account to cover Perry's lump sum benefit of $222,200, and Perry demanded immediate payment, Karchmer approved the application and issued Perry a check postdated to January 20, 1969.

Karchmer testified that it was unprecedented for an application to be prepared by NMU, processed by the Segal Company and approved by the trustees, with payment being made on it, in little more than half a day. Karchmer also testified that the payment to Perry was the first of its kind and was the largest payment ever made by the Officers Pension Plan.

On February 4, 1969, since NMU had not commenced suit as requested by plaintiffs in May of 1968, Judge Bryan signed an order authorizing the plaintiffs to sue under LMRDA.

In its memorandum of June 29, 1972, the court found plaintiffs had standing to sue defendants under Section 501 of LMRDA (29 U.S.C. § 501). Therefore, the issue remaining is whether in making the payment of $222,200 to Perry on January 16, 1969, Freedman, Segal and Karchmer breached their fiduciary duty as trustees and Curran and Wall breached their fiduciary duty as NMU officers.

### As to the Trustees (Freedman, Segal and Karchmer)

Article III, Section C of the Agreement and Declaration of Trust as revised to October 28, 1961 deals with the powers and duties of the trustees. Paragraph 1 provides:

" . . . The Trustees shall have full and sole discretion to determine the amount of such benefits and the terms and conditions of payment and shall have the power to conclusively determine all questions concerning the payment of benefits to any individual recipient or proposed recipient."

Paragraph 4 provides that the trustees shall not be liable "for any loss to, or diminution of the Fund, except due to their own wilful misconduct." Paragraph 5 provides:

"The Trustees . . . shall be protected in relying and acting upon the opinion of legal counsel (including opinion of legal counsel who is . . . a trustee hereunder) in connection with any matter pertaining to the administration or execution of this Trust Fund. No Trustee shall be liable for any action taken . . . by him unless such act . . . is the result of wilful misconduct, nor for the acts of any . . . attorney selected by the Trustees with reasonable care, nor for any act . . . of any other Trustee."

■ These provisions must be strictly construed, and they do not relieve a trustee of liability for a breach of trust constituting a willful violation of his duty, or committed in bad faith or with reckless indifference to the interests of the trust, or for any profit a trustee may have derived from the breach of trust. Restatement (Second) of Trusts, § 222 (1959); Browning v. Fidelity Trust Co., 250 F. 321, 325 (3d Cir. 1918) cert. denied, 248 U.S. 564, 39 S.Ct. 9, 63 L.Ed. 423 (1918); Newhouse v. Canal National Bank of Portland, 124 F.Supp. 239 (D.Maine, 1954).

■ While these provisions protect the trustees against liability resulting from negligence, Thompson v. Hays, 11 F.2d 244, 248 (8th Cir. 1926), the trustees may be held liable if they have "intentionally disregarded the rules which control the actions of prudent men in

conducting their own business affairs." Crabb v. Young, 92 N.Y. 56, 57 (1883); In re Howard, 110 App.Div. 61, 97 N.Y. S. 23, 24 (2d Dept. 1905), aff'd 185 N.Y. 539, 77 N.E. 1189 (1906).

Under the Pension Plan, the trustees were given sole discretion to make lump sum payments to a participant (NMU Officers Pension Plan, Article V, Section 8). However, neither the Plan nor the Agreement and Declaration of Trust authorized the trustees to make a lump sum payment to Perry in 1969 computed on the pension he would have been entitled to receive at the expiration of his contract on October 20, 1974. Nor does Perry's contract entitle him to such a lump sum payment. Paragraph 3 of Perry's contract hereinbefore set forth gave Perry two options upon the termination of his contract prior to October 20, 1974—he could either continue to receive his salary in full, including contributions to the NMU Officers Pension Plan during the balance of the term, or he could demand and receive at one time an amount equal to the total salary he would have earned to the termination, "including contributions to the NMU Officers Pension Plan." On January 16, 1969, NMU paid Perry an amount equal to the total salary he would have earned to the termination (October 20, 1974). Previously, on December 18, 1968, NMU prepaid the Officers Pension Plan the contributions it would have been required to pay to the termination ($41,-250.01).

The only obligation the trustees undertook when they signed the rider to Perry's contract was to include Perry as a participant of the Officers Pension Plan during the full period of the original term of the contract even if his employment was terminated prior to that time. With respect to accepting contributions to the Officers Pension Plan for Perry and paying Perry pension benefits, the trustees were bound by the terms of the Agreement and Declaration of Trust and the Pension Plan.

Freedman's legal opinion of January 16, 1969 stated that Perry was entitled to credit for covered employment for the period through October 20, 1974 based on his contract with NMU, pursuant to which "contributions have been made by the Union to the Plan for the period through October 20, 1974," and that Perry was "entitled to receive immediate payment." This was wrong, on both counts.

Under the Agreement and Declaration of Trust, the prepayment of contributions to the Officers Pension Plan on behalf of Perry was not authorized. Article II, Section 2 of the Amended Agreement and Declaration of Trust is the sole provision covering contributions to the Officers Pension Plan. It provides that NMU shall make quarterly payments to the Officers Pension Plan equal to 26% of the compensation paid by NMU to the participants in the Officers Pension Plan for that quarter. Moreover, as Karchmer testified, "Payments which were made to the trustees were made without specific application to any beneficiary of the Plan. There were no separate accounts for beneficiaries."

Nor was there any legal basis, despite Freedman's opinion, for the payment to Perry of a lump sum pension of $222,-200 on January 16, 1969. This pension was payable on October 20, 1974, and then only if the trustees at that time exercised their discretion under Article V, Section 8 of the Pension Plan to pay Perry a lump sum. Before October 20, 1974, this court and the Court of Appeals held that the inclusion of Perry in the Officers Pension Plan violated NMU's constitution.

Freedman acted simultaneously as a trustee, counsel to the trustees, and counsel to NMU. He had drawn the Perry contact, and represented Perry in the earlier stages of this litigation. The evidence shows that he dictated his legal opinion from the top of his head while in Philadelphia and had his name signed to it by Sovel. He showed a reckless indifference to his duty as a trustee as well as the interests of his fellow trustees, who relied on his opinion. Indeed, he was indifferent to his duty to NMU

as well, as he knew that Perry's participation in the Officers Pension Plan had been challenged by the plaintiffs (which challenge was later sustained by this court and the Court of Appeals). Moreover, he knew, or should have known, that NMU made quarterly payments to the Officers Pension Plan equal to 26% of the compensation paid *for that quarter*, and, as pointed out by Karchmer, the payments were made without specific application to any beneficiary, as there were no separate accounts for beneficiaries.

■ The court concludes with regret that Freedman acted with reckless indifference to his duty as trustee. Therefore, as trustee, he will be subject to surcharge for the lump sum pension paid to Perry.

Segal, an acknowledged expert in the pension field, testified that the payment of Perry's lump sum pension several years before the termination of his contract was unique in his experience. He was also aware of the pressure to which the trustees were being subjected to make the payment on the same day that Perry was presumably fired, and that very little time elapsed between his request for Freedman's legal opinion and its delivery.

Karchmer was put on inquiry the previous December when he received NMU's check for $41,250.01 for Perry's account, which he thought unusual enough to photostat. He testified that Perry's lump sum payment was the first of its kind and largest ever made by the Officers Pension Plan, and processed faster than any other. Despite this, he delivered a post-dated check to Perry on the day of Perry's application.

■ The evidence does not show that Segal and Karchmer knew that the inclusion of Perry and other non-officers in the Officers Pension Plan had been challenged by the plaintiffs. Moreover, the Agreement and Declaration of Trust specifically protected them in "relying and acting upon the opinion of legal counsel (including opinion of legal counsel who is . . . a trustee . . . ) in connection with any matters pertaining to the administration or execution of this Trust Fund." Both Segal and Karchmer relied on, and acted upon, Freedman's opinion in making the payment to Perry. While on the facts presented they were negligent in doing so, there is no evidence that they wilfully violated their duty as trustees or were guilty of bad faith. The Agreement and Declaration of Trust specifically protects them from liability from the acts of any other trustees. Accordingly, they cannot be surcharged for the payment to Perry, and judgment may be entered dismissing the action as against them.

### NMU Officers (Curran and Wall)

■ Curran, President of NMU, had a fiduciary responsibility under Section 501(a) of LMRDA (29 U.S.C. § 501(a)) with respect to the funds of NMU. For the purposes of Section 501(a), the funds paid by NMU to the Officers Pension Plan and by it to Perry were funds of NMU. Curran negotiated the Perry employment contract and signed it on behalf of NMU, and had also signed the Agreement and Declaration of Trust. Although he dismissed plaintiffs' request as propaganda, Curran knew that the plaintiffs had requested NMU to institute this action to recover monies paid to the Officers Pension Fund for the account of non-officers on the ground that such payments violated the NMU constitution, and that it was charged that Perry was a non-officer. Curran was in a position of trust to expend NMU funds only in accordance with the NMU constitution. Curran also knew or should have known that the Agreement and Declaration of Trust did not authorize the prepayment of contributions to the Officers Pension Plan. Nevertheless, on December 18, 1968, when he fired Perry for the first time, he instructed Breit to prepare a check from NMU funds in the amount of $41,250.01 to be paid to the Officers Pension Plan

for Perry's account, and on the following day he signed the check, which was then forwarded to the Officers Pension Plan. However, the $41,250.01 has been recovered by NMU, so that even if he violated his fiduciary duty, there is no occasion for surcharging him in this amount.

 Curran testified that on January 16, 1969 he fired Perry (for the second time), and that immediately thereafter he instructed Controller Breit to prepare everything that was coming to Perry. He signed the check to Perry in the amount of $104,595.16 covering Perry's wages, severance pay, vacation pay, and "all other monies due him" through October 20, 1974. This would appear to have been in accordance with Paragraph 3 of Perry's contract, which provided that in the event of termination, Perry could demand and receive at one time an amount equal to his total salary and other fringe benefits which he would have received during the balance of the original term. The evidence indicates that Curran dominated the people who had anything to do with the payment from the Officers Pension Plan to Perry. Karchmer testified, "Well, to go in to Joe [Curran] is a very fearful process." (451). Freedman testified that he was told by Sovel, "Mr. Perry is anxious to get it through and everybody here is anxious to get finished with the thing." (305). When Perry appeared in Karchmer's office to obtain the check for $222,200 he was accompanied by Freedman's partner Sovel, Strassman, an officer of NMU, and Shapiro, Executive Director of the NMU Pension Welfare Fund. (459). Undoubtedly, Curran used the power of his office to get Perry everything that was coming to him on January 16th. However, there is no evidence that on January 16th Curran directed the payment to Perry of $222,200 or directed Freedman to furnish the legal opinion to the trustees.

Consequently, on the evidence presented, plaintiffs have failed to prove that Curran breached his fiduciary duty under LMRDA. See Richardson v. Tyler, 309 F.Supp. 1020 (N.D.Ill.1970).

 Wall, Secretary-Treasurer of NMU, knew that plaintiffs had requested NMU to institute action to recover monies attributed to the Officers Pension Plan with respect to non-officers. Indeed, he testified that he brought this to the attention of Curran and the NMU lawyers. However, the evidence establishes that he played no part either in the payment of the $41,250.01 paid to the Officers Pension Plan on December 18, 1968 or in the events of January 16, 1969. Accordingly, there is no basis for finding that Wall breached his fiduciary duty under LMRDA.

For the foregoing reasons, defendant Freedman is surcharged with respect to the $222,200 paid by the Officers Pension Plan to Perry and which has not been repaid. The application to surcharge the defendants Segal, Karchmer, Curran and Wall is denied, and the action is dismissed with respect to them.

The foregoing constitutes the court's findings of fact and conclusions of law. F.R.Civ.P. 52(a).

Settle judgment on notice.

## APPENDIX

AGREEMENT made this 2d day of August, 1966, and between the NATIONAL MARITIME UNION OF AMERICA, AFL-CIO (hereinafter referred to as the "NMU"), and WILLIAM PERRY (hereinafter referred to as "Perry").

WHEREAS, Perry has been employed by NMU in the capacity of Assistant to the President since the ____ day of ____, 1958, pursuant to Article 13, Section 1(f) of the Constitution of the National Maritime Union of America, AFL-CIO; and

WHEREAS, Perry has been of invaluable service to the President of the NMU in the performance of his vast responsibilities and important duties in the conduct of the union activities, and Perry also has been of great assistance to all the National Officers in assisting them in their duties and in otherwise performing important duties on behalf of NMU; and

WHEREAS, the NMU, its President and the National Officers desire that Perry continue to serve as Assistant to the President of NMU, as an inducement to him to continue to serve in this capacity and intending to be legally bound hereby, it is mutually agreed by and between the parties as follows:

1. The parties hereby agree that Perry shall continue in the employ of NMU to serve as Assistant to the President of NMU until October 20, 1974. Upon the expiration of said original term, said employment shall continue thereafter under the same terms for successive additional terms of four (4) years each, unless either party notifies the other in writing, at least six (6) months prior to the expiration of any term of this Agreement, of intent to terminate said Agreement, at the end of the then current term. In absence of such notice, this Agreement shall continue from four years to four years until so terminated.

2. Perry's compensation during the term of this Agreement, or any renewal or extension thereof, shall be the same as the compensation paid to him as of July 1, 1966, including all contributions to the NMU Officers Pension Plan and any insurance or other fringe benefits presently available or payable, or which may become payable or available in the future to the NMU National Officers during the term of this Agreement or renewal or extension thereof. The rights, compensation and benefits conferred hereunder shall be in addition to those presently and hereafter enjoyed by and accruing to Perry (including but not limited to severance pay and pension benefits, inter alia), and shall not be deemed to take away, change, diminish or limit any of same in any manner.

3. In the event that this Agreement or Perry's employment should be terminated, with or without cause, prior to the expiration date hereof or of any renewal or extension, or in the event that Perry should become incapacitated from performing his duties, either totally or partially, by reason of illness, injury, physical incapacity or any other cause, Perry shall be entitled to continue to receive his said salary in full, including contributions to the NMU Officers Pension Plan and any other fringe benefits payable to the National Officers as under paragraph 2 hereof, during the balance of the term hereof or any renewal or extension. In the event, however, of such termination, or if such incapacity should be substantial or total, Perry shall have the option to demand and receive at one time or over any period that he shall specify an amount equal to the said total salary, including contributions to the NMU Officers Pension Plan and any other fringe benefits payable to National Officers which he would have received during the balance of the original term any renewal or extension hereof.

4. For the purposes of determining Perry's entitlement to participation in and benefits from, the NMU Officers Pension Plan, the parties recognize, understand and agree that Perry shall be deemed to be a "Participant" in "Covered Employment" (as defined in the said Plan) during the full period of the original term of this Agreement, and the full four-year period of each renewal or extension thereof, notwithstanding anything to the contrary contained in paragraph 3 or any other provision of this Agreement.

5. This Agreement and all the terms and conditions hereof shall be binding upon the parties, and their heirs, beneficiaries, representatives, successors and assigns

IN WITNESS WHEREOF, the parties have hereunto duly executed this

Agreement the day and year first above written.

(s) William Perry
 William Perry

NATIONAL MARITIME UNION OF AMERICA, AFL-CIO

By (s) Joseph Curran
 Joseph Curran, President

(s) Shannon Wall
 Shannon Wall, Secretary-Treasurer

(s) Mel Barisio
 Mel Barisio, Vice-President

(s) Rick Miller
 Rick Miller, Vice-President

(s) James Martin
 James Martin, Vice-President

(s) Robert Nesbitt
 Robert Nesbitt, National Representative

(s) Peter Bocker
 Peter Bocker, National Representative

(s) Leo Strassman
 Leo Strassman, National Representative

Intending to be legally bound hereby and in consideration of the reliance hereto by the parties to the foregoing Agreement, we hereby acknowledge and agree that paragraph 4 of the said Agreement shall be binding upon us and our successors in determining William Perry's entitlement to participation in, and benefits from, the NMU Officers Pension Plan.

(s) Abraham E. Freedman
 Abraham E. Freedman

(s) Martin E. Segal
 Martin E. Segal

(s) Leon Karchmer
 Leon Karchmer

Trustees, National Maritime Union Officers Pension Plan